IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HEIDE K. BARTNETT,<br><br>  Plaintiff,<br><br>v.<br><br>ABBOTT LABORATORIES, MARLON SULLIVAN and ALIGHT SOLUTIONS, LLC,<br><br>  Defendants. | Case No. 2020 CV 2127<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**

Plaintiff Heide K. Bartnett ("Bartnett"), by her attorneys, for her First Amended Complaint against Defendants Abbott Laboratories, Marlon Sullivan and Alight Solutions, LLC (collectively "Defendants"), states as follows:

**NATURE OF THE ACTION**

1. This case arises from Defendants' reckless actions in allowing an unknown individual to prey on and steal hundreds of thousands of dollars from the retirement savings of the Plaintiff, Heide Bartnett, a retired former employee of Abbott Laboratories, which were held in Abbott Corporate Benefits Stock Retirement Plan (the "Plan"). Ms. Bartnett is a participant in the Plan. Defendants failed to enforce a security question routine set up for security purposes on the Defendants' website, www.abbottbenefits.com, and instead simply provided a one-time code over-the-phone that was used to loot Ms. Bartnett's account. Then, rather than communicating with Ms. Bartnett via email concerning changes to her account, as Defendants knew Ms. Bartnett preferred, they mailed notices, allowing the theft to be consummated and $245,000 to be transferred out of the country via email to an Indian IP address before Ms. Bartnett could take any

steps to halt the fraud. Through these acts and omissions, Defendants breached their fiduciary duty to Ms. Bartnett under the Employee Retirement Income Security Act of 1974 ("ERISA"). Ms. Bartnett brings this lawsuit to require Defendants to restore her lost assets and investment income, as well as her attorneys' fees and costs.

## THE PARTIES AND THE PLAN

2. At all relevant times, Plaintiff Heide Bartnett has been a participant in the Plan— a 401(k) savings plan regulated and subject to ERISA.

3. Defendant Abbott Laboratories is an Illinois corporation with its principal place of business in Abbott Park, Illinois, with net sales in 2018 of more than $30.5 billion. Abbott Laboratories functions as a Plan Sponsor of the Stock Retirement Plan and is a fiduciary of the Plan within the meaning of ERISA, 29 U.S.C. §1002(21), in that it exercises authority or control respecting management or disposition of the Stock Retirement Plan's assets, it exercises discretionary authority or discretionary control respecting management of the Plan, and/or it has discretionary authority or discretionary responsibility in the administration of the Plan.

4. Marlon Sullivan is the named Plan Administrator and the Named Sponsor of the Plan. As named Plan Administrator, Mr. Sullivan is a fiduciary of the Plan.

5. Alight Solutions LLC ("Alight") is an Illinois limited liability company with its principal place of business in Lincolnshire, Illinois. At all relevant times, Alight provided contract administration, record-keeping, information management, and benefit plan administration services for the Plan pursuant to an agreement between Alight and Abbott Laboratories. At all relevant times, Alight was a fiduciary of the Plan within the meaning of ERISA 29 U.S.C. § 1002(21), in that it exercised authority or control respecting management or disposition of the Plan's assets, it

exercised discretionary authority or discretionary control respecting management of the Plan, and/or it had discretionary authority or discretionary responsibility in the administration of the Plan. Upon information and belief, Alight operated the Plan's telephone customer service center, identifying itself as "Abbott Benefits Center," and website at www.abbottbenefits.com. Both of these resources provided Plan participants the ability to manage their accounts, including requesting distribution of benefits. Upon information and belief, Alight exercised control over Plan assets by directing distributions from participants' accounts, including the unauthorized distributions it allowed from Ms. Bartnett's account.

6. On information and belief, Alight maintained a computer log on which all computer and telephone inquiries concerning a Plan account are maintained and to which all call center representatives can routinely access.

7. Employees of Abbott Laboratories may enroll immediately in the Plan after joining Abbott Laboratories, and Plan participants are vested in any company contributions after two years of service.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over Plaintiff's claims in Count I pursuant to 28 U.S.C. § 1331 and the specific jurisdictional statute for claims brought pursuant to 29 U.S.C. § 1132(e) and (f).

9. This Court has subject matter jurisdiction over the state law claim in Count II pursuant to 28 U.S.C. § 1367(a), as Count II is so related to the claim in Count I that it forms part of the same case or controversy under Article III of the United States Constitution.

10. Venue lies within the Northern District of Illinois pursuant to 29 U.S.C. § 1132(e)(2), because the Plan is administered in part in this District and the breaches alleged herein occurred in part in this District.

## STATEMENT OF FACTS

**A. Ms. Bartnett's Stock Retirement Plan Account.**

11. Ms. Bartnett is a retired former-employee of Abbott Laboratories, having worked for Abbott Laboratories from 2002 – 2012 in a sales capacity.

12. As a former employee of Abbott Laboratories, Ms. Bartnett participated in the Plan. When she retired as an Abbott Laboratories employee, Ms. Bartnett chose to leave her retirement savings in the Plan in reliance on Defendants' ability to maintain and safeguard her Plan account.

13. As of December 31, 2018, the Plan had net assets of $9,424,709,000.

14. Ms. Bartnett was able to access her Plan account via www.abbottbenefits.com, a website maintained by Alight.

15. Ms. Bartnett's preferred delivery method for communication with Defendants is via email.

16. Ms. Bartnett did not share her account password with any individual other than Thomas R. Bartnett, her husband and primary beneficiary of Ms. Bartnett's Plan account assets.

17. Over the course of her employment, Ms. Bartnett contributed funds to her Plan.

18. As a vested participant in the Plan, Ms. Bartnett continued to receive periodic Plan account statements and notifications by mail.

19. As of December 31, 2018, Ms. Bartnett had a total of $362,510.84 in her Plan account. A true and accurate copy of Ms. Bartnett's account statement as of December 31, 2018, is attached as <u>Exhibit A</u>. Ms. Bartnett's assets in her Plan account were her primary retirement savings.

20. Ms. Bartnett trusted and relied on the promises and expertise of the Defendants to keep her Plan assets secure.

21. For example, the abbottbenefits.com website states:

> SUPPORTING EMPLOYEES & FAMILIES IN ALL THEIR WORK & LIFE MOMENTS
>
> When it comes to your family, your health and your life, we care for employees while they're here at Abbott and beyond. We strive to provide peace of mind for all the moments of your life – with health care benefits, programs and resources that build confidence in your ability to take care of yourself and your family.

22. Similarly, Alight's website assured its beneficiaries that:

> From chatbots, robotic process automation (RPA), mobile-first to consumer-centric service models, we are committed to investing in innovations that benefit all of our clients.

23. Alight also advertises itself on its website as providing the following services for employees whose benefits are managed by Alight:

- "Full range of technology-enabled plan solutions, from innovative online and digital technologies to customer care to financial wellbeing strategies and services designed to understand and support each employees' goals and needs;"

- "A robust retire online plan website, featuring everything your people need to help manage their plan—plan reporting, benefit calculation, and retirement income estimating and modeling,

> including decision-support tools and financial education and planning information"; and

- "Retirement Specialist support through our Service Center, who serve as a single point of contact to help your employees through all phases of retirement, offering knowledge and support for Social Security, Medicare and other common retirement question."

**B.    Defendants Permit Ms. Bartnett's Stock Plan Account to Be Looted.**

24.    On or about December 29, 2018, at 10:56 PM Central Time, an unknown user accessed Ms. Bartnett's account via the internet, and chose the "forgot password" option.

25.    The unknown user entered the last four digits of Ms. Bartnett's social security number and her date of birth. These entries were challenged by the website.

26.    The unknown user elected to receive a one-time-code via e-email, allegedly to Ms. Bartnett's email account, rather than answer online security questions. Ms. Bartnett has no record of ever receiving such an email.

27.    The one-time-code was successfully entered and access to the account was granted. The unknown user changed the password and added to the account direct deposit information for a SunTrust bank account.

28.    Two days later, on December 31, 2018, an unknown individual (the "Impersonator") contacted the Abbott Benefits Center, claiming to be Ms. Bartnett. The Impersonator called from the phone number 360-956-0666, which did not belong to Ms. Bartnett, had never been used by Ms. Bartnett, and was not associated with Ms. Bartnett's Plan account.

29.    The Impersonator told the customer service representative that they had tried to process a distribution online, but were unsuccessful.

30. Defendants' customer service representative, in a gross dereliction of duty, asked the Impersonator if they still lived at XXXX Sweetbriar, Darien, Illinois, XXXXX, thereby providing Ms. Bartnett's personal information to the Impersonator. The customer service representative told the Impersonator that a new bank account that has been added to the customer's account, such as the SunTrust Bank account, must be on file for seven days before money can be transferred from the Plan account to the newly added account.

31. The customer service representative offered to schedule a call with "Heide" for Monday. The Impersonator declined the offer, saying "I'll be busy all day Monday." The customer service representative told the Impersonator that the Impersonator could go online and initiate the direct deposit on Monday.

32. On January 1, 2019, Defendants, despite Ms. Bartnett's preferred method of communication being via email, "snail mailed" a "Direct Deposit Address Addition" notice to Ms. Bartnett, advising her of the change made to her direct deposit access to her account. Defendants failed to send Ms. Bartnett an email advising her of the change. Had Defendants done this, Ms. Bartnett would have had an opportunity to question the addition of the SunTrust Bank account before any unauthorized withdrawals were made from her Plan account.

33. On January 4, 2019, Ms. Bartnett's husband attempted to access Ms. Bartnett's account, but was unable to, as Ms. Bartnett's password had been changed by the unknown individual. Mr. Bartnett properly answered the security question asked by the site and changed her account password. At this point, no funds had been transferred.

34. Following this change, that same day, Defendants followed Ms. Bartnett's direction as to her preferred method of communication and sent an email to her account advising her of the password change.

35. On January 8, 2019, at approximately 7:54 AM, the Impersonator called the Abbott Benefits Center, again claiming to be Ms. Bartnett. As before, the Impersonator used the same phone number, beginning with a 360 area code. Once again, this phone number is not associated with Ms. Bartnett's Plan account or with Ms. Bartnett.

36. Rather than requiring the Impersonator to answer Ms. Bartnett's online security questions, Defendants simply sent another one-time code, allegedly to Ms. Bartnett's email address. The Bartnetts have no record of ever receiving this emailed one-time code.

37. The Impersonator inquired about a transfer of funds, claiming it was needed for purchasing a house.

38. At that time, upon the Impersonator's request, Defendants authorized $245,000 to be transferred from Ms. Bartnett's account to the SunTrust Bank account. Ms. Bartnett did not authorize this transfer and she did not have a SunTrust Bank account.

39. On January 9, 2019, Defendants sent a letter via first class U.S. Mail to Ms. Bartnett, advising her of the transfer of funds. Once again, they failed to communicate with Ms. Bartnett via her preferred email communication method about the withdrawal. Ms. Bartnett did not receive this letter until January 14, 2019. Had Defendants communicated information to Ms. Bartnett via email, she would have been able to halt the transfer and would have stopped the transfer.

40. Also on January 9, 2019, Defendants received two additional calls from the Impersonator. The Impersonator asked for the current balance of the Plan account, and asked if the funds had been sent to the Impersonator's bank. Defendants' customer service representative reported that that the transfer request had been processed, and that the funds would be transferred on January 14, 2019.

41. On that same call, Defendants' customer service representative again provided the impersonator with Ms. Bartnett's address.

42. On January 15, 2019, Ms. Bartnett called Abbott Benefits Center to report that she had discovered that money was missing from her Plan account. Defendants froze the account at this time.

43. Defendants advised Ms. Bartnett to contact police and she did so.

44. After Ms. Bartnett reported the theft from her account, Detective Rick Hellmann of the Darien Police Department sent subpoenas to "Abbott Benefits," Northern Trust Bank, and SunTrust Bank, requesting all records related to Ms. Bartnett's Plan account and the January 2019 transfer therefrom to be sent to the Darien Police Department in written form.

45. On March 14, 2019, SunTrust Bank responded to the subpoena. The response stated that based on the information provided, SunTrust was unable to locate records for the account holder.

46. On March 22, 2019, DuPage County States' Attorney Elizabeth Giesel received subpoena results from Alight, including a report of its internal investigation. This internal report provides the details of the allegations in paragraphs 26 – 43 of this Complaint.

47. On March 26, 2019, Detective Hellmann received subpoena results from Abbott Laboratories.

48. On March 27, 2019, Detective Hellmann investigated the I.P. address 172.82.144.204, from which Ms. Bartnett's account had been accessed. After running this I.P. address through Maxmind, a law enforcement database, Detective Hellmann found it to be registered to Quickpacket LLC. Detective Hellmann sent a subpoena to Ms. Giesel, a DuPage County States' Attorney, to be served on Quickpacket in an attempt to obtain information as to who this I.P. address is assigned to.

49. On April 2, 2019, Detective Hellmann received an email from Ms. Giesel, containing the subpoena results from Quickpacket. The email stated that the I.P. address was assigned to Kirtan Singh, living in the city of Panta, in the state of Bihar, in the country of India.

**B.**     **Prior Incidents of Unauthorized Distributions under Alight's Watch**

50. Defendants knew or should have known of the possibility of individuals attempting to make, and/or successfully making, unauthorized withdrawals from retirement plans that they oversaw or managed, due to prior similar incidents.

51. Prior to 2017, Alight was known as Aon Hewitt.

52. In 2013, Aon Hewitt was targeted by an international cybercrime ring, which used unlawful means to obtain customer login information to access customer accounts and steal millions of dollars from several financial institutions as outlined in the criminal complaint styled *U.S. v. Sarapka, et al.*, No. 13-6089 (D.N.J. June 13, 2013).

53. According to the Identity Theft Resource Center, in 2015, Aon Hewitt suffered a data breach in which, due to a manual mailing error, clients' names, dates of birth, Social Security Numbers, and pension specific information (such as average salary, service, and accrued benefits) were sent to an unintended recipient.

54. According to the Identity Theft Resource Center, in 2015, Aon Hewitt issued a data breach notification informing plan participants that it had inadvertently allowed certain participants in a benefits program to access fellow participants' Social Security numbers.

55. According to the Identity Theft Resource Center, in 2016, Aon Hewitt issued a data breach notification in which it allowed for the potential unauthorized access to the records of 2,892 individuals where the personal information potentially accessed by an unknown third person or persons included participants' names, Social Security numbers, contact information, dates of birth, beneficiary information, employee ID numbers, employment status, and health care plan status.

56. In September and October of 2016, Alight was alleged to have allowed an unauthorized user to initiate three separate unauthorized transfers totaling $99,000 from a 401(k) retirement account for which Alight provided benefit plan administration services, including operating the plan's online services. After the employee's efforts in 2016 and 2017 to have her employer and Alight investigate the unauthorized transfers failed and after Alight and the former employer failed to reimburse the employee for the stolen funds, Alight was sued in federal district court in the case styled *Berman v. Estee Lauder, et. al.*, Case No. 3:19-cv-06489 (N.D. Cal.). In that case, plaintiff asserted claims of breach of fiduciary duty for Alight's failure to confirm authorization for distributions with the plan participant before making distributions and for general security lapses involving the failure to provide timely notice of distributions, failure to identify

and halt suspicious distribution requests, and failure to establish distribution processes to safeguard plan assets against unauthorized withdrawals. Further, according to the complaint filed in that action, in 2016, plaintiff reported the stolen assets to her local police departments as well as to the FBI.

57. Upon resolution of the lawsuit, an Alight spokesperson informed the media that Alight takes data security and protection of accounts seriously and is committed to maintaining a competitive, innovative approach to fraud prevention as threats evolved. Alight further communicated that it regularly communicates with its clients about its policies and practices.

58. In 2019, Alight issued a Breach Notification to the California Attorney General stating that since September 22, 2014, Alight had issued communications to certain benefit plan participants that inadvertently included their Social Security Numbers in the properties of the emails. Another Alight Breach Notification issued to the California Attorney General further indicated that from October 1, 2016 to February 22, 2019, URLs linking to certain of Alight's benefits websites included individual participants' Social Security Numbers and dates of birth.

59. Upon information and belief, the United States Department of Labor is currently investigating Alight for additional failures with respect to the improper processing of unauthorized distributions as a result of cybersecurity breaches related to ERISA plan clients' accounts, and, in violation of its service provider agreements, failing to immediately report cybersecurity breaches and the related unauthorized distributions to ERISA plan clients after its discoveries.

60. In light of the increased risk related to data security and cybersecurity fraud, many plan sponsors and service providers provide security guarantees that pledge to reimburse

participants for losses from unauthorized transactions contingent upon additional security measures. Alight does not provide such a guarantee.

61. Upon information and belief Abbott Laboratories and Sullivan were, or should have been, aware of Alight's demonstrated inability to prevent unauthorized access to Plan participants' information and/or unauthorized transfers of Plan funds.

62. Despite prior instances of data breaches and unauthorized transfers, as well as Alight's practices that led to a Department of Labor investigation, along with Alight's general lax attitude toward data security, Sullivan and Abbott Laboratories continued to allow Alight to provide benefit plan administrative services.

### C. Ms. Bartnett Unsuccessfully Attempts to Resolve the Theft of Her Funds with Abbott Laboratories.

63. Following her initial January 15, 2019 phone call to Abbott Benefits Center, Ms. Bartnett continued to call several times per week, hoping that Defendants would be able to retrieve or return the funds looted from her account.

64. Ms. Bartnett also was referred to an Abbott Laboratories attorney, Shauna Fulbright-Paxton ("Shauna"). On January 31, Ms. Bartnett's attorney, Bernard Lord, sent a demand letter to Abbott Benefits Center, to which Shauna responded. That response contained no guaranties that Ms. Bartnett's would be made whole.

65. Between February and September 2019, Ms. Bartnett spoke with Eric, Christine, Stephany and Martin in Abbott Benefits Center. All she learned was that $48,991 had been recovered as the taxes withheld from the fraudulent withdrawal, which had been returned to her account.

66. On April 6, 2019, Ms. Bartnett received a mailed statement from SunTrust Bank stating that $59,494.02 had been recovered and deposited into her account.

67. On April 15, 2019, Martin from Abbott Benefits Center called and told Ms. Bartnett that she had received back all that she was going to receive from Abbott.

68. On April 16, 2020, Mr. Lord contacted Shauna regarding this determination. Shauna stated that "[t]his is a legal matter and the person who provided information has no authority to speak on the ultimate resolution. This is with Legal. I'm going to track down more as soon as I can but please rest assured that resolution rests me my team [sic]."

69. Between approximately March 2019 and September 2019, Ms. Bartnett's attorney, Bernard Lord, communicated regularly with Shauna. For example, on or about July 26, 2019, Mr. Lord received an email from Shauna stating she was waiting to hear more from "the powers that be" at Abbott Laboratories regarding a resolution.

70. On August 1, 2019, Shauna sent Mr. Lord another email stating that one of the individuals in the decision chain was dealing with an emergency in another matter.

71. The next day, Mr. Lord informed Shauna that Ms. Bartnett had the Darien Police Department records and that he had listened to the recordings, which did not show Defendants in a positive light. Shauna asked if she could receive a copy of records from the Darien Police Department.

72. During this time, on information and belief, Shauna had or should have had access to Alight's investigative report, including recordings of the relevant calls from the Impersonator

which described Defendants' errors and omissions in transferring $245,000 from Ms. Bartnett's Plan account to the SunTrust Bank account without Ms. Bartnett's authorization.

73. On or about August 15, 2019, Mr. Lord provided copies of Darien Police Department records to Shauna and a call was set for August 21, 2019. However, on August 21, 2019, Shauna postponed the call until August 27, 2019.

74. During the August 27, 2019 telephone call, Shauna again provided no information other than to say that the person who would make the decision was out of the country, but she did not identify that person.

75. Shauna told Mr. Lord that she would call him on August 29, 2019. Shauna did not call that day, and thereafter there was no meaningful communication between Abbott Benefits Center or Abbott Laboratories and Ms. Bartnett or Mr. Lord until December 2019.

76. In or about December 2019, Abbott Laboratories contacted Mr. Lord and made a take-it-or-leave-it offer to restore just 10% of the funds that had been stolen from Ms. Bartnett's Plan account, an unsatisfactory resolution for Ms. Bartnett in light of all the circumstances.

77. At no time did Shauna advise Ms. Bartnett or Mr. Lord that Ms. Bartnett should file an administrative appeal related to the theft from her Plan account or identify any individual to whom Ms. Bartnett or Mr. Lord could appeal.

78. Given the history of the negotiations, any administrative appeal would be futile. Moreover, Ms. Bartnett's months-long attempt to resolve the theft of her funds with Abbott Laboratories' attorney served any purpose of an administrative review.

## CLAIMS FOR RELIEF

### Count I
### Claim to Restore Plan Losses Pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2) Against All Defendants

79. Ms. Bartnett realleges paragraphs 1-67.

80. ERISA imposes fiduciary duties of loyalty and prudence, as well as a fiduciary duty to monitor.

81. ERISA § 409, 29 U.S.C. § 1109, provides that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by ERISA Title I shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and shall be subject to such other equitable or remedial relief as the court may deem appropriate.

82. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes a plan participant to bring an action for appropriate relief under ERISA § 409, 29 U.S.C. §1109.

83. Alight breached its fiduciary duties by causing, allowing, or processing unauthorized distributions of Ms. Bartnett's Plan account assets; failing to confirm authorizations for distributions with Ms. Bartnett before making distributions; failing to provide timely notice of distributions to Ms. Bartnett by telephone or email; failing to identify and halt suspicious distribution requests, such as requests for multiple distributions to accounts in different banks; failing to establish distribution processes to safeguard the Plan's assets against unauthorized withdrawals; failing to monitor distribution processes, protocols, and activities; and related acts and omissions.

84. Alight failed to use the care, skill, prudence, and diligence required of an ERISA Plan fiduciary under the circumstances to protect Ms. Bartnett's Plan assets.

85. Abbott Laboratories breached its fiduciary duties by hiring and failing to monitor service provider Alight, despite Alight lacking experience with retirement plans, Alight's inability and failure to provide quality plan administration services, Alight's inadequate policies and practices, recent litigation and/or enforcement actions against Alight, and Alight's poor performance record, all of which caused the damages suffered by Ms. Bartnett.

86. Abbott Laboratories breached its fiduciary duties by renewing its contract with Alight despite information regarding Alight's failures with respect to cybersecurity and data privacy, which Abbott Laboratories knew or should have known of, all of which caused the damages suffered by Ms. Bartnett.

87. Marlon Sullivan breached his fiduciary duties by allowing Abbott Laboratories to hire Alight and failing to monitor service provider Alight, despite Alight lacking experience with retirement plans, Alight's inability and failure to provide quality plan administration services, Alight's inadequate policies and practices, recent litigation and/or enforcement actions against Alight, and Alight's poor performance record, all of which caused the damages suffered by Ms. Bartnett.

88. Marlon Sullivan breached his fiduciary duties by allowing Abbott Laboratories to renew its contract with Alight despite information regarding Alight's failures with respect to cybersecurity and data privacy, which Marlon Sullivan and Abbott Laboratories knew or should have known of, all of which caused the damages suffered by Ms. Bartnett.

89. As a direct and proximate result of Defendants' breaches of fiduciary duty described above, Ms. Bartnett has been damaged, including the loss of $245,000 from Ms. Bartnett's 401K account and investment earnings thereon.

**REQUEST FOR RELIEF**

FOR RELIEF, Plaintiff Ms. Bartnett requests that the Court enter judgment in her favor and against each of the Defendants, jointly and severally, as to Count I and:

(a) Declare that Defendants, and each of them, have breached their fiduciary duties of loyalty and prudence;

(b) Order that Defendants, and each of them, restore to Ms. Bartnett's Stock Retirement Plan account $245,000, plus reasonable investment earnings thereon from the distribution dates to the date of judgment herein and reimburse Ms. Bartnett for federal tax liability and penalties and interest thereon caused by the unauthorized withdrawal from her Plan account;

(c) Award Ms. Bartnett reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g);

(d) Award Ms. Bartnett pre-and post-judgment interest; and

(e) Provide such other equitable and remedial relief as is appropriate.

### Count II
### Breach of the Illinois Consumer Fraud and Deceptive
### Practices Act (815 ILCS 505/1 *et seq.*) by Alight

90. Ms. Bartnett realleges paragraphs 1-74.

91. Alight represents that its services are of a particular standard, quality, or grade, in that it promotes itself as an entity capable of safeguarding the assets of any employee whose retirement plan is maintained by Alight.

92. Alight's public representations are made with the intent that employers and employees will utilize Alight's services to administer and protect their retirement fund assets, and in turn, Alight will be financially compensated for administering retirement plans.

93. Alight's representations regarding its ability to manage plan assets were false, misleading and/or unfair, in the following ways:

   (a) Failing to send Ms. Bartnett email notifications of the transactions leading to the unauthorized withdrawal of $245,000 from her Plan account;

   (b) Failing to adequately train call center representatives how to address multiple calls from a phone number not associated with an account;

   (c) Failing to train call center representatives to escalate calls from numbers not associated with an account when they lead to a request for a withdrawal of eighty-eight (88) percent of liquid funds in a Plan account;

   (d) Failing to train call center representatives to ask for rather than volunteer participants' personal information to callers; and

   (e) Failing to implement adequate security measures aimed at preventing unauthorized transfers from Plan participants' accounts and training call center representatives how to spot suspicious telephone transactions and report such suspicious transactions to supervisors and immediately notify participants thereof by email or telephone.

94. Alight's failure to institute measures which adequately protected Ms. Bartnett's assets, Alight's public representations as to their ability to manage plan assets constitute an unfair act or practice.

95. These representations occurred in the course of conduct involving trade or commerce.

96. Ms. Bartnett has suffered actual damages due to the plaintiff's unfair acts, in that she relied upon Alight's representations that Alight would protect her Plan assets, she allowed Alight to administer her Plan assets, and that Alight failed to protect her Plan assets.

**REQUEST FOR RELIEF**

FOR RELIEF, Plaintiff Ms. Bartnett requests that the Court enter judgment in her favor and against Alight as to Count II, award her damages of at least $245,000 plus the amount required

to pay federal and state tax liability plus any penalties and interest thereon, punitive damages, pre and post judgment interest, her costs and such further relief as is appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury with respect to Count II.

Respectfully submitted,

**HEIDE BARTNETT**

By:     /s/ Todd A. Rowden
        One of Her Attorneys

Todd A. Rowden (trowden@taftlaw.com)
James L. Oakley (joakley@taftlaw.com)
Donnell J. Bell (dbell@taftlaw.com)
Taft Stettinius & Hollister LLP
111 E. Wacker Drive, Suite 2800
Chicago, IL, 60601
Phone No.: (312) 527-4000